## ARNOLD v. GREENE.
### Patent Appeal No. 2849.

Court of Customs and Patent Appeals.
Feb. 1, 1932.

Charles E. Tullar, of Schenectady, N. Y. (Alex D. Salinger, of Boston, Mass., and Claude H. Mott, of Schenectady, N. Y., of counsel), for appellant.

Pennie, Davis, Marvin & Edmonds, of New York City (Clarence M. Fisher, of Washington, D. C., of counsel), for appellee.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office, in an interference proceeding, awarding appellee priority of invention of counts relating to improvements in methods of operating electric furnaces.

No testimony was taken by either party. The sole question in the case is, Can Greene make the counts of the interference, which are claims in the Arnold patent, copied by Greene in his application? Before the Law Examiner, Arnold moved to dissolve the interference, which motion was overruled. The Examiner of Interferences therefore rendered a pro forma decision awarding priority of invention to Greene.

Greene states that his present application is a continuation in part of three other applications filed in 1909, 1913, and 1917, respectively, which applications are not of record.

Counts 1 and 8 are illustrative and follow:

"1. In the method of operating electric arc furnaces, the step comprising providing at least three available voltages, and utiliz-ing an intermediate voltage for starting the melt."

"8. In the method of operating electric arc furnaces, the step comprising providing at least three available voltages, and protecting the furnace walls against undue heat radiation by utilizing an intermediate voltage for starting and completing a melting operation, a higher voltage during such of the melting period as sufficient scrap is available to bury the arc, and a still lower voltage for refining."

The Board of Appeals, in describing and discussing the invention, said:

"The specific feature of novelty set forth in the counts resides in beginning or starting the melting with a suitable voltage and subsequently raising that voltage for a second portion of the melting stage and finally lowering the voltage below the starting voltage for the refining operation. All the counts are not so limited as, for example, counts 1 and 2 do not specifically include more than the utilization of an intermediate voltage, nothing being stated as to when, if at all, the other two of the three voltages are used. Counts 3 and 4 do not specify any use being made of more than two of the three available voltages. It will be unnecessary in view of our disposition of the matters raised on appeal to consider further the possible scope of the counts.

"In electric furnaces of the arc type which are used for melting down and refining metals, the latter are usually in the form of cold scrap metal or metal in irregular pieces and the proportions of the various elements of the metal must be closely regulated particularly in the making of special steels and steel alloys. In melting down this scrap metal or metal in irregular pieces, the electrodes are usually brought into contact with the material and then slightly withdrawn in order to strike the arc which generates the heat to initiate the melting operation. Obviously there is more or less irregularity of the current as the arc may move from one portion of the charge to another incident to the varying and variable resistance of the charge. After the arc has existed for a period, the charge directly in contact with the arc becomes melted and it is easier thereafter to maintain the arc and the electrodes may be brought nearer together and the voltage may be reduced. The reduction in voltage is rendered necessary for the reason that the long arc incident to the high voltage sets up intense heat which is radiated and may injuriously affect the walls of the crucible. This is particularly true after the charge surrounding the electrodes has

melted and ceases therefore to protect the walls from the intense radiated heat from the arc. There is nothing new in the foregoing and it had long been the practice before either party filed his application to so operate electric arc reducing furnaces.

"The Snyder patent 1,379,942, discloses substantially the foregoing. Since it was well understood that various charges of scrap or other metal to be reduced so varied as to require different voltages to properly start the melting operation and since in furnaces of this type it was usual to have available the means for varying the voltage and the length of the arc or arcs, if there was needed any inventive concept to enable an operator to vary the voltage up or down as he saw fit, that inventive concept must be deemed to have resided in the specific order of voltage variation recited in the more specific counts and possibly implied in some of the broader counts. With the construction disclosed by Arnold as well as with the various constructions disclosed by Greene, the means for varying the voltage in substantially any order desired is shown, so that the workman, in his observance of the operation he was seeking to perform, could obtain the best results. It would seem, in consequence, one skilled in the art and having before him the disclosure of either of these parties, more particularly the disclosure found in Greene's application, would need but a mere suggestion as to the order of varying the voltage in order to carry out the method recited in these counts. Without quoting at length the various portions of Greene's specification, which portions are quoted in the brief presented on behalf of Greene, we think the law examiner was right in his conclusion that Greene is entitled to make the counts. We regard the statement in Greene's original specification, 'However, my invention is not limited to starting with high voltage for I find it advantageous often, when operating, to raise the power during the course of operation,' when read in connection with the other portions of his specification and the various modifications disclosed in his drawing, as fully supporting the view that he contemplated as one method of operation that disclosed in the counts.

"While we have carefully considered the views presented by Arnold in his brief, we are wholly unable to reach any other conclusion than that one skilled in this art would fully understand that the above quoted portion of Greene's specification meant that the operation would be started by a suitable voltage and afterward the voltage would be raised "during the course of operation." It is abundantly set forth by Greene that the final refining operation is to be conducted at a voltage lower than the starting voltage. We are fully satisfied that whatever invention there may be involved in the issue it is fairly disclosed in Greene's application."

For the purposes of the decision of this case, we think that the above-quoted portion of the board's decision sufficiently describes the invention, the state of the art at the time the invention was made, and the problem which the inventors were attempting to solve.

We have very carefully examined the Arnold patent and the Greene application in order to determine whether or not the subject-matter of the counts, when read in connection with the Arnold patent, was disclosed in the Greene application, and we are constrained to hold that Greene's application does not disclose the subject-matter of the counts involved.

Arnold's patent teaches unmistakably that there are inherent objections in starting the melt in an electric arc furnace with a high voltage, because such method produces fluctuations of load which are extremely objectionable. It furthermore teaches that a low voltage such as is used to finish the melt could not be used to start the same, since it would not be high enough to establish contact. It also teaches that it is important to use the low voltage in finishing the melt. Arnold emphasizes starting the melt with a voltage intermediate between high and low, and this, we think, is the very essence of the invention as taught and claimed by Arnold.

Greene's invention relates to means for controlling the voltage of an electric arc furnace and the method of control in utilizing such means, and the inventive idea more particularly rests in affording the operator the opportunity of using whatever voltage he deems necessary in order to accomplish the result desired. When his application as a whole is considered, it seems obvious that he assumed that the melt would be started with a higher voltage than the other voltages used subsequently thereto. We find nowhere in the Greene specifications or claims any warrant for the conclusion that Greene believed or taught that it was objectionable to start the melt with a high voltage, and, while he devoted much space in his application to telling how his device could be operated so as to permit free selection of any voltage neces-

sary, he has not taught or claimed anywhere that it was desirable to start with an intermediate voltage.

The Board of Appeals, in its decision, points out that in the Greene specification is found the following: "However, my invention is not limited to starting with high voltage for I find it advantageous often, when operating, to raise the power during the course of operation. * * *"

The Board concluded that in view of this statement, when read in connection with other portions of his specification, Greene contemplates more than one method of operation, and that he discloses the method of starting the melt with a voltage lower than the highest voltage required for melting.

We do not so read the Greene specifications. If he teaches anything with respect to which voltage the melt should be started with, we think he teaches the method of starting it with the high voltage. In teaching the use of his selective method, he certainly did not teach that it was undesirable to start with a high voltage. Since the claims in the Arnold specification are limited to starting with an intermediate voltage or a voltage lower than the melting voltage, we cannot see how the Greene application discloses the subject-matter of the counts, and therefore conclude that the board was in error in holding that Greene could make the counts.

Admittedly, Greene teaches a method of starting the melt with a high voltage, and, if it could be said that he also taught a method of starting with a low voltage, then, in the same application, he would be teaching the doing of the opposite thing. If Arnold disclosed a patentable discovery, it must necessarily rest in the particular order of applying the voltages. Another disclosure by another inventor which teaches that one may select any voltage for any step in the melt, or which teaches the opposite order of applying voltage, can hardly be said to disclose the same invention.

In the opinion of the Board, after discussing the prior art and Greene's application, is found the following: " * * * It would seem, in consequence, one skilled in the art and having before him the disclosure of either of these parties, more particularly the disclosure found in Greene's application, would need but a mere suggestion as to the order of varying the voltage in order to carry out the method recited in these counts."

This would seem to go to the question of the patentability of the subject-matter. It is neither our privilege nor duty to pass upon this question, and we must confine ourselves solely to the question of priority, which involves a determination of Greene's right to make the counts.

For the reasons aforesaid, we therefore hold that the Board was in error in holding that Greene could make the counts in interference, and in sustaining the decision of the Examiner of Interferences in awarding priority of invention of the subject-matter of the counts to Greene. The motion to dissolve the interference should have been granted.

The decision of the Board of Appeals is reversed.

Reversed.